## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

AMANDA FOWLER,

     Plaintiff,

v.

HANNAH UNITIS
ANTHONY LUPO,
ERIC BOSLEY, and
VITALCORE HEALTH STRATEGIES, LLC,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Amanda Fowler, by and through her attorneys at the Civil Rights Litigation Group, hereby submits this Complaint and Jury Demand, alleging as follows:

### INTRODUCTION

1.    Ms. Fowler brings this civil rights action seeking justice for the serious and lasting harm she suffered as a pregnant pretrial detainee when employees and/or contractors at the El Paso County Jail repeatedly denied her pleas for her prescription medication necessary to avert a life-threatening medical emergency. The defendants' deliberate indifference to Ms. Fowler's serious medical needs not only subjected Ms. Fowler to a life-threatening medical emergency, but caused her youngest two children to be born prematurely and resulted in ongoing medical complications, which she has continued to suffer from long afterward.

2.    Ms. Fowler has a medical condition called Addison's disease, which means that her adrenal glands do not produce sufficient cortisol, and, as a result, she is prescribed to take

1

medication twice daily to replace the hormone without which her body would shut down. When Ms. Fowler turned herself in at the El Paso County Jail while over seven months pregnant, she did everything she could to ensure continuity of care and limit the risk of harm to both herself and her unborn child: she arrived with her necessary prescription medication and supporting documentation; she clearly explained her medical condition to Defendants, including the significant risk that she would suffer serious medical harm without her medication; and she alerted Defendants to her worsening symptoms when they did not provide her this medication.

3.       Despite this, Defendants repeatedly refused to provide Ms. Fowler with her necessary medication and refused to facilitate her access to someone else who could address her medical need when, without medication, her condition deteriorated into adrenal crisis. Defendants' deliberate indifference to Ms. Fowler's serious medical needs—of which she repeatedly and expressly warned—caused Ms. Fowler's organs to begin shutting down, ultimately forcing her to endure multiple hospitalizations, extreme pain and fear, and new and dangerous complications to her contemporaneous and subsequent pregnancies.

4.       Ms. Fowler and her newborns spent over 40 days in the hospital, resulting in over $300,000 in medical bills because Defendants failed to take reasonable measures to prevent or address Ms. Fowler's medical crisis. Ms. Fowler seeks compensation for physical and emotional harm, pain and suffering, medical complications to her and her children, and economic damages, as well as punitive sanctions against the individual defendants to punish and deter their reckless dereliction of duty and violation of her rights.

**JURISDICTION AND VENUE**

5.       Plaintiff's federal claim is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

6.       Plaintiff's state law claim is brought pursuant to C.R.S. § 13-21-131 and Article II,

Sections 3, 20, and 25 of the Colorado Constitution.

7.     This Court has subject matter jurisdiction of the federal claims pursuant to 28 U.S.C. § 1331.

8.     This court has supplemental subject matter jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in the District of Colorado, pursuant to 28. U.S.C. § 1391(b)(2) because all the events alleged herein and which give rise to this action occurred in the State of Colorado.

10.    Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3).

## PARTIES

11.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

12.    Plaintiff Amanda Fowler was, at all times relevant to the claims set forth herein, a resident of the State of Colorado.

13.    Defendant Hannah Unitis was, at all times relevant to this Complaint, employed by the El Paso County Sheriff's Office as a detention officer. She worked in the El Paso County Jail in Colorado Springs, Colorado, and acted under color of state law. She is identified in her individual capacity.

14.    Defendant Anthony Lupo was, at all times relevant to this Complaint, employed by the El Paso County Sheriff's Office and/or VitalCore, as a nurse and/or LPN, to provide medical services to inmates within the El Paso County Jail in Colorado Springs, Colorado. He acted under color of state law. He is identified in his individual capacity.

3

15.     Defendant Eric Bosley was, at all times relevant to this Complaint, employed by the El Paso County Sheriff's Office and/or VitalCore, as a nurse, to provide medical services to inmates within the El Paso County Jail in Colorado Springs, Colorado. He acted under color of state law. He is identified in his individual capacity.

16.     VitalCore Health Strategies, LLC, ("VitalCore") is a private corporation that contracted with the El Paso County Jail to provide medical care to inmates within the jail at the time of the incident. At all times relevant, VitalCore was acting under color of state law, as it contracted with Sheriff Roybal and/or El Paso County, Colorado, to provide professional healthcare management services, including appropriate medical treatment and medications to those incarcerated in the County's jail. At all relevant times, VitalCore is believed to have employed Defendants Lupo and Bosley, and/or other medical providers, and was responsible for their acts and/or omissions under the doctrine of *respondeat superior.*

## FACTUAL ALLEGATIONS

17.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

***Ms. Fowler's Medical Conditions***

18.     In February of 2021, Ms. Fowler was diagnosed with a severe form of Addison's disease, meaning that her adrenal glands are not functioning and do not produce sufficient amounts of the hormone, cortisol.[1]

---

[1] Addison's disease is a rare condition affecting many parts of the body, which can quickly escalate to an adrenal crisis, at which point the condition requires an emergency response because "[w]ithout fast treatment, an adrenal crisis can lead to death." Mayo Clinic, "Addison's Disease," December 21, 2024, https://www.mayoclinic.org/diseases-conditions/addisons-disease/symptoms-causes/syc-20350293.

4

19.     Left untreated, Addison's disease can quickly turn into an adrenal—or Addisonian—crisis, causing extreme weakness and fatigue; dizziness or fainting from low blood pressure; sudden and severe pain in one's legs, lower back, or stomach; confusion, lack of consciousness, or coma; seizures; and death if not promptly treated, as a person's organs begin shutting down without cortisol.[2]

20.     To prevent an adrenal crisis and death, Addison's disease is treated with hormone replacement therapy, most often by taking oral corticosteroids (synthetic cortisol) like hydrocortisone for the rest of one's life.

21.     Accordingly, Ms. Fowler's doctor prescribed Ms. Fowler hydrocortisone to treat her Addison's disease.

22.     In February of 2024, Ms. Fowler needed to take ten-milligram hydrocortisone pills—two in the morning and one in the evening—in order to live.

23.     Ms. Fowler took such medication every morning at 8 a.m. and again in the evening.

24.     Also in February of 2024, Ms. Fowler was over seven months pregnant with her fourth child.

***Ms. Fowler's Arrival at El Paso County Jail***

25.     On February 25, 2024, Ms. Fowler—having learned of a warrant issued for her arrest—prepared to turn herself in to law enforcement officials at the El Paso County Jail.

26.     She prepared by taking her medications for the day and gathering everything she would need to continue treatment while incarcerated: her hydrocortisone pills and documentation

---

[2] The Cleveland Clinic similarly emphasizes the emergency nature of an adrenal crisis, as studies indicate that "up to 25% of people who have an adrenal crisis die from it." *See* Cleveland Clinic, "Adrenal Crisis," August 3, 2022, https://my.clevelandclinic.org/health/diseases/23948-adrenal-crisis.

from a recent doctor's visit that identified her condition as well as her active prescription for
hydrocortisone.

27.     At around 6:00 p.m. on February 25, 2024, Ms. Fowler turned herself in at the El
Paso County Jail and was booked as a pretrial detainee.

28.     When she turned herself in, Ms. Fowler had in her possession her current
prescription bottle of hydrocortisone pills.

29.      Ms. Fowler also brought with her to the jail medical records identifying her
Addison's diagnosis and her active hydrocortisone prescription.

30.     El Paso County Sheriff's Office ("EPSO") staff collected Ms. Fowler's property,
including her medication, when they booked her as a pretrial detainee.

31.     EPSO staff then had Ms. Fowler change into jail attire before taking her to a local
hospital.

32.     As a pregnant woman, Ms. Fowler needed to be cleared for custody by hospital
staff.

33.     While waiting to be taken to the hospital, Ms. Fowler encountered Defendant
Anthony Lupo.

34.     Defendant Lupo was a nurse employed and/or contracted by EPSO to provide
health care to the people detained and/or incarcerated in the El Paso County Jail.

35.     Ms. Fowler informed Defendant Lupo that she had Addison's disease.

36.     Ms. Fowler also described to Defendant Lupo what it means for her to have
Addison's disease—how it affects her body and what medications she needs to address it.

37.     Defendant Lupo interrupted Ms. Fowler's explanation of Addison's disease, telling
her that he "knew all about Addison's."

38.     When Ms. Fowler emphasized that he would know, then, how important it was that she receive her Addison's medication—that she could die without it—he rolled his eyes and refused to talk to her further until she was brought back from the hospital.

39.     At the hospital, Ms. Fowler informed the detention officer accompanying her that she needed to take her hydrocortisone pills for her Addison's disease multiple times a day or else she would die.

40.     This detention officer told Ms. Fowler that he would inform the relevant EPSO staff of this information upon their return to the jail, and, on information and belief, he informed Defendant Lupo.

41.     In the time that Ms. Fowler was at the hospital, Defendant Lupo called Nurse Practitioner Kandee Hammill about Ms. Fowler's prescriptions.

42.     NP Hammill ordered Defendant Lupo to ensure that Ms. Fowler receive two of her hydrocortisone tablets in the morning and one tablet in the evening.

43.     Once hospital staff cleared Ms. Fowler for custody, Ms. Fowler was returned to the jail.

44.     The hospital provided medical documentation to EPSO staff, including notice that she needed to take hydrocortisone.

45.     Defendant Lupo was the EPSO nurse responsible for Ms. Fowler's medical intake screening, which he conducted upon Ms. Fowler's return from the hospital

46.     Defendant Lupo took only about five minutes to speak with Ms. Fowler.

47.     During these five minutes, Defendant Lupo did not ask Ms. Fowler many of the questions that appeared on her intake screening form, despite him filling in answers.

48.     Nor did Defendant Lupo take any of her vital signs.

7

49.     However, Defendant Lupo did appear to recognize and understand her serious medical needs, as he marked the intake screening form indicating that she was currently prescribed hydrocortisone—as he had confirmed with NP Hammill—and had brought the medication to the jail.

50.     Ms. Fowler told Defendant Lupo again that she had Addison's disease, what Addison's disease was, and that she would need access to her Addison's disease medication—specifically two of her hydrocortisone pills in the morning and one in the evening.

51.     Ms. Fowler also specified that she would need her morning dose between 8:00 a.m. and 10:00 a.m. the following day, and that she could *die* without this medication.

52.     Defendant Lupo had possession of Ms. Fowler's hydrocortisone pills at that time.

53.     Defendant Lupo was dismissive of Ms. Fowler and her discussion of her serious medical need.

54.     Defendant Lupo exasperatedly said, "Yep, whatever," and, "I know," in response to Ms. Fowler's statements.

55.     Ms. Fowler also explained that she had brought her outside medical records to the jail as proof that she needed her prescribed hydrocortisone medication.

56.     Defendant Lupo, however, told Ms. Fowler that he didn't need to see her outside medical records.

57.     Defendant Lupo verified that Ms. Fowler had an active prescription for the hydrocortisone pills, had possession of that prescription medication, and he was responsible for ensuring she was provided with timely access to the medication.

58.     However, after about five minutes of interaction, Defendant Lupo waived his hand dismissively at Ms. Fowler and told her they were done.

59.    As a health care professional, Defendant Lupo knew the importance of, and that he had a duty to, listen to his patients as they convey their conditions and necessary medications.

60.    As a medical professional charged with providing health care to those detained and/or incarcerated at the El Paso County Jail, Defendant Lupo knew the importance of his role in facilitating access to medical care. He knew he had a duty to provide or otherwise facilitate care which a doctor had recommended.

61.    Defendant Lupo knew the importance of conveying critical medical information (such as conditions and required medications) about detainees and/or inmates to those who could provide the necessary care. Indeed, he had a duty to convey information necessary to facilitate the care recommended, including the distribution of medication.

62.    Defendant Lupo failed to ensure that Ms. Fowler, as someone with a serious medical condition, would have access to her life-saving medication during her detention at the El Paso County Jail.

63.    Defendant Lupo did not inform critical officials—others capable of providing or facilitating Ms. Fowler's access to her necessary medication—of Ms. Fowler's Addison's disease.

64.    Defendant Lupo did not inform such critical officials needed to dispense the hydrocortisone medication.

65.    Defendant Lupo did not provide Ms. Fowler with medication.

66.    This was despite Defendant Hammill ordering Defendant Lupo to provide the medication.

67.    Defendant Lupo did not schedule, facilitate, or otherwise arrange for Ms. Fowler to be given her medication, as he was required and/or had a duty to do, at any time she was incarcerated.

*Ms. Fowler's Time in Housing Unit A3*

68.    Very late on February 25, 2024, or early in the morning on February 26, 2024, Ms. Fowler was assigned and moved to a cell in Housing Unit A3 of the El Paso County Jail.

69.    Defendant Unitis was a detention officer responsible for Housing Unit A3 and those incarcerated in it on February 26, 2024.

70.    On the morning of February 26, 2024, Ms. Fowler did not receive her morning hydrocortisone dose.

71.    The morning dose of hydrocortisone is the most important dose of the day when treating Addison's disease.

72.    At around 8:00 a.m., Ms. Fowler approached Defendant Unitis and told her that she needed to take her morning dose of hydrocortisone between 8:00 a.m. and 10:00 a.m.

73.    Ms. Fowler told Defendant Unitis that she could die without this medication, which was treatment for Addison's disease.

74.    Ms. Fowler explained Addison's disease and explained that taking hydrocortisone was the only way to prevent an adrenal crisis, a serious medical issue which could be life-threatening.

75.    She also told Defendant Unitis that she had brought the necessary medication and documentation to the jail, and that these items should be in Ms. Fowler's inventory from when EPSO staff took her property the night before.

76.    In response, Defendant Unitis told Ms. Fowler that she would call a nurse.

77.    Ms. Fowler then stepped away from Defendant Unitis but watched her for the next forty-five minutes.

78.    In these forty-five minutes, Defendant Unitis never called a nurse or anyone else

about Ms. Fowler's condition or necessary medication.

79.     Therefore, at around 8:45 a.m. on February 26, 2024, Ms. Fowler then approached Defendant Unitis again, repeating her same explanation of Addison's and her need for hydrocortisone to avoid significant medical harm, up to and including death.

80.     Again, Defendant Unitis told Ms. Fowler that she would call a nurse, but again, Defendant Unitis did not do so.

81.     Over the next forty-five minutes, Ms. Fowler began feeling dizziness and lightheadedness, and noticed that her baby was not moving in her uterus when he was typically very active; she recognized these symptoms as the beginning of an adrenal crisis.

82.     At around 9:30 a.m. on February 26, 2024, Ms. Fowler spoke with Defendant Unitis a third time because she still hadn't received her hydrocortisone dose and the window in which she was medically required to take it was quickly closing.

83.     During this third conversation, Ms. Fowler told Defendant Unitis about the symptoms she was experiencing and how it was likely the beginning of an adrenal crisis due to not having taken her medication for Addison's disease.

84.     Ms. Fowler again asked Defendant Unitis for help getting her Addison's medication.

85.     Ms. Fowler emphasized the significant risk that she would face serious medical harm without it, including that it could be fatal.

86.     Defendant Unitis responded with, "Okay," and said, again, that she would "call a nurse."

87.     Defendant Unitis failed to contact a nurse, facilitate the dispensation of the medication, or provide Ms. Fowler with access to someone who could.

88.    By about 10:30 a.m., Ms. Fowler still had not received her medication.

89.    At the same time, Ms. Fowler was feeling even worse than she had before: in addition to her earlier symptoms, she had a skull-splitting headache and severe pain in her lower back, and she was also exhausted despite having woken up only a few hours before. She reported these symptoms to Defendant Unitis.

90.    Over the next few hours, Ms. Fowler's condition continued to deteriorate.

91.    At approximately 1:00 p.m., while Ms. Fowler was attending her court appearance, Defendant Eric Bosley reviewed Ms. Fowler's medical chart, including her then-current diagnoses and medications (including hydrocortisone), as well as medical records from UCHealth.

92.    However, Defendant Bosley did not take any steps to schedule, facilitate, or to provide Ms. Fowler with her medication.

93.    When Ms. Fowler returned to her housing unit from her court appearance, at around 2:00 p.m. on February 26, 2024, she was pale, swaying, and visibly confused.

94.    At around 2:30 p.m., Ms. Fowler went to Defendant Unitis for the fourth time and told her that she was in adrenal crisis and needed her Addison's medication, hydrocortisone, to prevent further harm—including death—to her and her unborn child.

95.    Ms. Fowler asked Defendant Unitis when she would be getting her hydrocortisone.

96.    Defendant Unitis told Ms. Fowler that she didn't know when Ms. Fowler would get her hydrocortisone.

97.    Ms. Fowler then told Defendant Unitis that she needed to go to the medical unit because she was feeling so sick.

98.    Defendant Unitis told Ms. Fowler that that would only delay her release from jail.

99.    Defendant Unitis took no action to take Ms. Fowler to the medical unit, to get her

12

medication, or to otherwise provide her access to medical care.

100.    When Ms. Fowler followed up, asking if she could file a complaint about the situation, Defendant Unitis denied Ms. Fowler the opportunity, telling Ms. Fowler that that would only extend her time in jail.

101.    At around 4:00 p.m. or 5:00 p.m., when EPSO staff brought food to those in Housing Unit A3, Ms. Fowler could barely get up and make it to the door of her cell.

102.    At this point, she again told Defendant Unitis—for the fifth time that day—that she needed her prescribed hydrocortisone.

103.    Ms. Fowler also told Defendant Unitis that her symptoms of adrenal crisis were getting worse, including that she was feeling extreme fatigue and that her legs felt as if they were made of lead.

104.    This time, Defendant Unitis told Ms. Fowler that she was going to get out of jail soon, indicating that Ms. Fowler wouldn't be receiving any help from any EPSO staff, including Defendants.

105.    Defendant Unitis was fully aware of the significant risk of serious medical harm— including death—to Ms. Fowler from not receiving the hydrocortisone pills she was prescribed for Addison's disease.

106.    Nevertheless, Defendant Unitis failed to contact medical staff or otherwise facilitate Ms. Fowler's access to any medical care for her life-threatening condition.

107.    Defendant Unitis refused to facilitate Ms. Fowler's access to personnel capable of evaluating or treating Ms. Fowler.

108.    Defendant Unitis was deliberately indifferent to Ms. Fowler's serious medical needs when she refused to fulfill her duty as gatekeeper.

*Continued Medical Issues After Ms. Fowler was Released from Jail*

109.     Ms. Fowler was released from the El Paso County Jail at around 7:00 p.m. on February 26, 2024.

110.     After EPSO staff returned to Ms. Fowler the property which she had brought to the jail, Ms. Fowler immediately went home and took hydrocortisone to try to mitigate the adrenal crisis she was experiencing, and then she fell asleep, utterly exhausted.

111.     It had been approximately twenty-eight hours since her body had last received any hydrocortisone.

112.     When Ms. Fowler woke up the next morning, feeling no better, she promptly went to the local hospital's emergency room, where she told them about having Addison's disease and not having taken any hydrocortisone until late the previous day.

113.     To prevent Ms. Fowler from dying, medical professionals at the hospital quickly gave Ms. Fowler the typical emergency dose of hydrocortisone to compensate for the period she did not get the medication.

114.     As a result of the hydrocortisone deficit and emergency response, Ms. Fowler developed gestational diabetes.

115.     Ms. Fowler did not have gestational diabetes prior to being incarcerated at the El Paso County Jail.

116.     Difficulties in recovering from an adrenal crisis while pregnant and developing gestational diabetes caused Ms. Fowler so many medical complications that she was in and out of the hospital for the remainder of her pregnancy.

117.     Ms. Fowler was hospitalized three times, for three days each, during the six weeks between her release from jail and the birth of her child.

118.    Ms. Fowler's hospitalizations were caused by her slow recovery from adrenal crisis and newly developed gestational diabetes (which was caused by the adrenal crisis).

119.    Hospitalization forced Ms. Fowler to be away from her older two kids[3] all while she tried to figure out what was happening and was terrified, not only for her own well-being, but for that of her unborn son; her mental health was abysmal.

120.    Prior to this incident, Ms. Fowler's third child, a daughter, had passed away in the hospital's neonatal intensive care unit ("NICU") just two days after she was born. This experience, when combined with the untreated adrenal crisis at the jail, caused her to feel terrified that she would lose the unborn baby she was pregnant with when she entered the jail. She feared her newborn would suffer heart issues and have to be taken to the NICU soon after she gave birth.

121.    These hospital stays also caused Ms. Fowler to lose wages, as she had to miss work and eventually take leave from work two weeks earlier than she had planned.

122.    The medical issues Ms. Fowler faced because Defendants denied her Addison's medication while in the El Paso County Jail further removed Ms. Fowler's control over her own pregnancy and limited her birthing options: while previously, Ms. Fowler's doctors told her that she would have had the option of inducing labor and of having a vaginal birth, Ms. Fowler could then only have her child via cesarian ("C-section") birth.

123.    Even for completely healthy individuals, a C-section is a major surgery that is riskier and takes a longer time to recover from than delivering a baby vaginally.

124.    Ms. Fowler gave birth to her son in the morning on April 15, 2024.

125.    Ms. Fowler's son had to be taken to the NICU, where he stayed for forty-eight

---

[3] In early 2024, Ms. Fowler was pregnant with her fourth child, but Ms. Fowler's third child passed away as a newborn.

hours because of the impact of gestational diabetes and the preventable adrenal crisis.

126.    And while Ms. Fowler had recovered from the previous three times she gave birth (both vaginally and by C-section) within a couple of weeks, it took her about ten weeks to physically recover from this fourth birth.

127.    Further, symptoms from an adrenal crisis can last for months after the acute crisis is over, and Ms. Fowler continued to struggle to get her Addison's disease under control for another six months after giving birth, during which she dealt with dizziness, dangerously low blood pressure, debilitating migraines, post-partum pre-eclampsia, extreme swelling, and extreme fatigue.

***Further Issues with Gestational Diabetes***

128.    Gestational diabetes is something that can go away after a person gives birth or it can be permanent; there is no way of knowing which it will be until the person delivers their child.

129.    Additionally, having gestational diabetes during one pregnancy increases the risk that a person will have gestational diabetes during subsequent pregnancies.

130.    The earliest that a person is typically diagnosed with gestational diabetes is when they are twenty-eight weeks pregnant.

131.    After her youngest son was born in April of 2024, Ms. Fowler's gestational diabetes appeared to pass.

132.    However, after she later became pregnant with her youngest daughter, born in July of 2025, Ms. Fowler again developed gestational diabetes, this time when she was only eighteen weeks pregnant—over two months before doctors typically even test a pregnant person for gestational diabetes.

133.    Ms. Fowler's grocery bills increased significantly so that she could consume a diet

16

that her doctors advised her would help to manage her gestational diabetes.

134.     And because of Ms. Fowler's gestational diabetes, she developed the heart conditions ventricular tachycardia and supraventricular tachycardia.

135.     Ventricular tachycardia and supraventricular tachycardia increased the risks associated with Ms. Fowler's most recent pregnancy.

136.     These heart conditions caused Ms. Fowler to have to cut back on work again.

137.     They also limited her daily activities and ability to do even simple actions like grocery shopping because of her high heart rate, chest pain, and dizziness, which forced her to sit and wait for symptoms to subside or else cause her to pass out.

138.     During this most recent pregnancy, Ms. Fowler's gestational diabetes also caused reduced fetal movements, high fetal heart rate, and fetal growth restriction (Ms. Fowler's youngest daughter was much smaller than expected for her gestational age, causing complications at birth).

139.     Ms. Fowler's youngest daughter was ultimately born five weeks prematurely, requiring twenty-four days' stay in the NICU.

140.     Even when Ms. Fowler and her husband were able to bring their newborn home, the infant needed to be given supplemental oxygen for another two weeks.

141.     While Ms. Fowler's gestational diabetes went away with the birth of her youngest child, it nevertheless puts her at a much higher risk for developing Type 2 diabetes in the future than those who have never had gestational diabetes.[4]

142.     Defendants' denial of medical care for Ms. Fowler's Addison's disease while she

---

[4] See Mary V. Diaz-Santana et al., *Persistence of Risk for Type 2 Diabetes After Gestational Diabetes Mellitus*, 45 Diabetes Care 864 (2022),
https://pmc.ncbi.nlm.nih.gov/articles/PMC9016728/pdf/dc211430.pdf.

was incarcerated in the El Paso County Jail—as well as their failure to facilitate her access to treatment—caused Ms. Fowler to suffer an adrenal crisis, which threatened her life and forced her subsequent medical providers to give her an emergency dose of hydrocortisone in order to save her life.

143.    The deprivation of medication leading to adrenal crisis also ultimately caused Ms. Fowler to develop gestational diabetes, increasing her risk of getting gestational diabetes during subsequent pregnancies, which she ultimately did—resulting in further medical issues for both herself and her youngest child.

## FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983, Fourteenth Amendment to the United States Constitution**
***Deliberate Indifference to Ms. Fowler's Serious Medical Needs***
**(Defendant Unitis, Lupo, and Bosley)**

144.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

145.    On the evening of February 25, 2024, the El Paso County Sheriff's Office took custody of Ms. Fowler, who was then over seven months pregnant.

146.    Thereafter, Ms. Fowler could not provide for her own care within the El Paso County Jail.

147.    Defendants were responsible for Ms. Fowler's medical care and had a duty to provide and/or facilitate prompt medical attention for inmates experiencing serious medical issues and conditions.

148.    In the little over twenty-four hours that Ms. Fowler spent in the custody of EPSO staff, including Defendants, Ms. Fowler put each staff member she encountered on notice every step of the way that she faced a significant risk of serious medical harm if she did not receive her

prescription medication.

149.     Ms. Fowler turn herself in at the jail with her medication and her medical records (reflecting her life-threatening condition and her prescription) in hand.

150.     Ms. Fowler told EPSO staff, including Defendants, at least eight times that she had a serious medical condition known as Addison's disease.

151.     Ms. Fowler told EPSO staff, including Defendants, at least eight times that she needed to take hydrocortisone to treat her Addison's disease at specific times of the day

152.     Ms. Fowler told EPSO staff, including Defendants, at least eight times that her body would go into adrenal crisis if she did not take hydrocortisone.

153.     And Ms. Fowler told EPSO staff, including Defendants, at least eight times that the resulting symptoms of adrenal crisis could cause her serious harm, including death.

154.     Ms. Fowler informed Defendant Lupo—a healthcare professional—of as much on two separate occasions, including during her intake screening.

155.     Defendant Lupo was also the one to verify that Ms. Fowler had an active prescription for hydrocortisone.

156.     NP Hammill ordered Defendant Lupo to provide Ms. Fowler with her hydrocortisone.

157.     Nevertheless, Defendant Lupo dismissed Ms. Fowler, saying he knew all about Addison's disease.

158.     Defendant Lupo never gave Ms. Fowler her prescribed hydrocortisone, nor ensured that other critical EPSO staff were aware of her serious medical needs or otherwise facilitated Ms. Fowler's access to adequate medical treatment.

159.     Defendant Bosley reviewed information about Ms. Fowler's condition and the

paramount need for her to receive hydrocortisone medication, but he also failed to take action necessary to schedule, facilitate, or otherwise dispense the medication.

160.    During this entire time, the medication was available to each provider in the jail.

161.    Ms. Fowler informed Defendant Unitis on five separate occasions of her life-threatening condition, her need for prescribed hydrocortisone at specific times of the day, of her symptoms as they developed, and of her significant risk of serious medical harm—including death—if she did not receive hydrocortisone.

162.    Still, Defendant Unitis failed to facilitate Ms. Fowler's access to adequate medical care.

163.    Defendant Unitis never called a nurse to evaluate or treat Ms. Fowler (despite telling Ms. Fowler that she would), never provided Ms. Fowler with her required medications herself, and even discouraged Ms. Fowler from going to the jail's medical unit or filing a complaint.

164.    Ms. Fowler also informed the detention officer accompanying her to the hospital before her booking of her need to take hydrocortisone pills for her Addison's disease multiple times a day or else she would die, and this detention officer informed the relevant EPSO staff, including Defendant Lupo, of this information upon their return to the jail.

165.    Despite knowing of Ms. Fowler's specific and serious medical need for hydrocortisone and the significant risk of serious harm she faced without it, the Defendants failed to act on that knowledge and take reasonable measures to provide Ms. Fowler with adequate medical treatment by either providing her with her necessary medications or by facilitating her access to medical professionals who could do so themselves.

166.    As a result, Ms. Fowler suffered an adrenal crisis, which endangered both her own

life and the life of her unborn child, required an emergency dose of steroids to prevent her death, and took her months to physically recover from.

167.    Defendants' deprivation of medication resulting in Ms. Fowler's adrenal crisis also caused Ms. Fowler to develop gestational diabetes, further endangering her pregnancy at the time, as well as her subsequent pregnancy, causing her both physical and emotional harm.

168.    Defendants Lupo, Bosely, and Unitis were acting under the color of state law when they disregarded and were deliberately indifferent to the substantial risk of serious harm to Ms. Fowler and failed to act reasonably to prevent such harm.

169.    The Defendants' conduct described herein deprived Ms. Fowler of the constitutional rights, privileges, liberties, and immunities secured by the Fourteenth amendment to the United States Constitution and was a motivating and proximate cause of Ms. Fowler's physical injuries and ailments, pain and suffering, mental anguish, emotional distress, permanent injuries, and medical bills.

## SECOND CLAIM FOR RELIEF
### C.R.S. § 13-21-131 and Article II, Sections 3, 20, and 25 of the Colorado Constitution
### *Deliberate Indifference to Ms. Fowler's Serious Medical Needs*
### (Defendant Unitis)

170.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

171.    As a pretrial detainee in the El Paso County Jail, Ms. Fowler had a right to adequate medical care pursuant to Article II, Sections 3, 20, and 25 of the Colorado Constitution.

172.    As EPSO staff responsible for Ms. Fowler's well-being, Defendant Unitis had a duty and a responsibility to ensure that Ms. Fowler's serious medical needs were properly addressed.

21

173.    Defendant Unitis had a duty and a responsibility to provide and/or facilitate prompt medical attention for detained and/or incarcerated persons with serious medical needs.

174.    Defendant Unitis had a duty and a responsibility to ensure that Ms. Fowler had access to adequate medical care while detained.

175.    As described above, Defendant Unitis knew or should have known that Ms. Fowler faced significant risk of serious medical harm, yet she denied Ms. Fowler her necessary prescription medication for Addison's disease and refused to facilitate her access to someone who could provide the medication to her.

176.    Defendant Unitis' choices caused Ms. Fowler's serious medical condition to escalate to a life-threatening adrenal crisis, causing harm to both her and her unborn children.

177.    Defendants Unitis was acting under the color of state law when she disregarded and was deliberately indifferent to the substantial risk of serious harm to Ms. Fowler and failed to act reasonably to prevent such harm.

178.    Defendant Unitis' conduct described herein deprived Ms. Fowler of the constitutional rights, privileges, liberties, and immunities secured by the Fourteenth amendment to the United States Constitution and was a motivating and proximate cause of Ms. Fowler's physical injuries and ailments, pain and suffering, mental anguish, emotional distress, permanent injuries, and medical bills.

### THIRD CLAIM FOR RELIEF
**Common Law Negligence and/or Medical Malpractice
Under Colorado Common Law
(Defendants Lupo, Bosley, and VitalCore)**

179.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

180. At all times relevant to this Complaint, VitalCore is believed to have employed Defendants Lupo and Bosley while contracting with the El Paso County Jail to provide medical services to those incarcerated within the jail.

181. Defendant VitalCore and the individual capacity medical defendants—Defendants Lupo and Bosley—had a duty to provide reasonable medical care to Ms. Fowler while she was detained within the jail.

182. Defendant VitalCore failed to enact appropriate or sufficient policies, practices, record-keeping, or communication regarding the health needs of the incarcerated population to treat and provide appropriate care regarding inmate medical issues in a timely and/or reasonably comprehensive manner, including specifically the ordering and dispensation of prescription medication.

183. Defendants Lupo and Bosley breached their duty of care by negligently failing to communicate, review, evaluate, order or dispense medication, and/or to treat Ms. Fowler's known medical condition.

184. Despite Ms. Fowler's repeated requests for medication, recitation of the dangers associated with not timely getting her medication, and despite their knowledge as medical professionals that there could be serious consequences if she did not get her medication, both providers failed at various timeframes to facilitate the provision and/or dispensation of hydrocortisone to Ms. Fowler.

185. Defendants Lupo and Bosley failed to act in accordance with the appropriate standard of care to facilitate care when Ms. Fowler's condition grew worse as a result of her not getting hydrocortisone.

186. Defendant VitalCore knew or should have known that medical staff who were

poorly or improperly trained with regard to such conditions or the necessity of providing medications as ordered and prescribed could result in severe injury and/or death.

187.    As the employer of the individual capacity medical defendants, VitalCore is responsible for their negligence under the doctrine of *respondeat superior*, and was the proximate cause of the harms described above.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Fowler respectfully prays that this Court enter judgment in her favor and against the Defendants for compensatory damages, punitive damages, interest as allowed by law, costs, expert witness fees, reasonable attorney fees as allowed by statute or as otherwise allowed by law, pre- and post-judgment interest, and for any other and further relief that this Court deems just and proper.

## PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE

Respectfully submitted this February 2, 2026.

                    *s/    Audrey DeRose Oliver*
                    Audrey DeRose Oliver
                    Raymond K. Bryant
                    Civil Rights Litigation Group
                    1543 Champa Street, Suite 400
                    Denver, Colorado 8020
                    P: (720) 515-6165
                    F: (720) 465-1975
                    audrey@rightslitigation.com
                    raymond@rightslitigation.com
                    *Attorneys for Plaintiff*